IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

R & R CAPITAL, LLC          :          CIVIL ACTION
                            :
     v.                     :
                            :
LYN MERRITT, et al.         :          NO. 06-1554

MEMORANDUM

McLaughlin, J.                              April 17, 2009

        This case involves a dispute over the possession and
ownership of three horses.  Plaintiff R&R Capital ("R&R") is an
investment company owned by Ira Russack and operated with the
help of his brother Harvey Russack.  R&R entered into a series of
business ventures with defendant Lyn Merritt and her fiancé
Leonard Pelullo.  Some of these investments involved the purchase
of horse farms in Chester County, Pennsylvania, and the purchase
of horses.

        As part of the reorganization of some of their business
ventures, R&R agreed to purchase three "pinhooking" horses.  The
identity of the corporate entity from which R&R bought the horses
is disputed.  R&R contends it purchased the horses from defendant
Merritt and her wholly-owned company, defendant Mer-Lyn Farms,
LLC.  Merritt contends R&R purchased the horses from Pandora
Farms, LLC, one of the jointly-owned business ventures between
Merritt and R&R.  In any event, after R&R purchased the horses,
the horses were left under Merritt's care and management.

Some months after the sale, the relationship between R&R and Merritt broke down.  R&R filed suit against Merritt in New York state court, alleging that she and Pelullo had defrauded them and seeking an accounting of their jointly-owned businesses. R&R subsequently filed this action in this Court seeking, originally, to obtain possession of the three horses.  R&R later amended its claims in this Court, continuing to seek possession of two of the horses but seeking to rescind its purchase of the third horse on the ground that Merritt had concealed the fact that the horse was suffering from laminitis at the time R&R purchased it.  Merritt has asserted a counterclaim for her costs in training, caring, and feeding for the horses.

The Court held a bench trial on October 25 and 26, 2006, on R&R's claim and Merritt's counterclaim.  In August 2008, R&R filed a motion for contempt alleging that Merritt had violated an order of this Court enjoining her from selling or otherwise disposing of the horses while in her possession.  The motion alleges that Merritt has gelded and leased one of the horses which R&R sought to replevin.  R&R filed a supplemental motion for contempt in January 2009 alleging Merritt may also have leased the other horse at issue in the replevin claim.  In its motions, R&R states it no longer seeks replevin of the allegedly gelded horse and seeks sanctions awarding R&R the purchase price of both horses at issue in the replevin claims and

2

the dismissal of Merritt's counterclaim for expenses related to them.  In opposition to the motion, Merritt has suggested that this case may have been mooted by the New York litigation.

The Court will schedule a hearing on R&R's motions for contempt in a separate Order.  In this Memorandum and its associated Order, the Court will address the issues raised in the bench trial.  The Court will make its findings of fact and issue a verdict on R&R's claim for rescission for sale of the third horse, which is not at issue in R&R's motion for contempt.  The Court will also make findings as to R&R's claim for replevin of the first two horses and Merritt's counterclaim for expenses, but will not render a verdict on those claims, pending the Court's decision on the contempt motions.  To the extent Merritt wishes to argue that issues in this matter are moot, she may do so at the contempt hearing.

The Court finds for R&R on its claims for rescission of the contract of sale for the third horse.  The Court finds that the party from whom R&R purchased this third horse was Merritt and that she must return the purchase price of $150,000 for this horse to R&R once R&R tenders to her ownership of the horse.  On Merritt's counterclaim, the Court finds that Merritt has established that R&R is liable for $28,432.76 in expenses for the horses.  On R&R's claim for replevin, the Court finds that

R&R would be entitled to possession of the two horses at issue in this claim, upon satisfaction of Merritt's counterclaim.

I.   Findings of Fact

   A.   Ira and Harvey Russack Meet Lyn Merritt and Leonard
        Pelullo and Decide to Invest Together

   Ira and Harvey Russack are brothers.  Both Russacks had been involved for many years in the retail apparel business in New York.  In 2002, Ira Russack received several millions of dollars from an unexpected real estate deal, renting a property he owned in lower Manhattan to a company that had been displaced by the September 2001 attacks on the World Trade Center. 10/25/06 Tr. at 19-20, 162; 10/26/06 Tr. at 7, 10.

   To invest his money, Ira Russack formed R&R Capital. R&R is entirely owned by Ira Russack, but is managed by Harvey Russack.  Harvey Russack holds the position of managing director of R&R and takes care of day-to-day bookkeeping and other managerial responsibilities.  Ira Russack signed off on all investments made by R&R.  10/25/06 Tr. at 164; 10/26/06 Tr. at 21.

   In 2003, the Russacks were introduced by their cousin, Michael Blumenthal, to Lyn Merritt and Leonard Pelullo.  Pelullo was a real estate developer.  Blumenthal described Pelullo to the Russacks as a "real estate genius" who could provide them with "good investment opportunities" in real estate.  Pelullo refers

to Merritt as his fiancée;  Merritt refers to Pelullo as her
boyfriend.  Merritt owned a litigation support business, which
did document management and organization for law firms in
Florida, Pennsylvania, and New York.  She also, beginning in
2002, owned land in Chester County, Pennsylvania, where she lived
with Pelullo and raised horses.  10/25/06 Tr. at 8-11, 14, 157,
162-63.  10/26/06 Tr. at 7; 8/11/06 Pelullo Dep. at 8-10, 14.

    The first meeting between the Russacks, Merritt, and
Pelullo took place in Michael Blumenthal's office in New York.
Soon afterwards, the Russacks met with Pelullo and Merritt in
Chester County, Pennsylvania, to discuss forming a partnership to
invest in real estate.  During that visit, the Russacks were
introduced to the area's horse culture.  After this meeting the
Russacks agreed to go into business with Pelullo and Merritt.
10/25/06 Tr. at 163; 10/26/06 Tr. at 8-9, 21-22.

    When Pelullo first met the Russacks in 2003, he had a
criminal record.  The evidence presented to the Court as to the
specifics of Pelullo's convictions is confused.  By his own
account, at the time he was deposed in August 2006, Pelullo had
been convicted of federal charges in at least two separate
criminal proceedings, one in Philadelphia, Pennsylvania, and one
in Newark, New Jersey.  Pelullo testified that the charges for
which he was convicted included criminal racketeering.  Merritt

testified that these charges included embezzlement and money laundering.  10/25/06 Tr. at 14-16; Pelullo 8/11/06 Dep at 10-12.

Pelullo was out of prison from January 2002 through June 2005.  When Pelullo and Merritt first met the Russacks in 2003, Pelullo had been released from prison because his then-pending conviction had been set aside on habeas review and this habeas decision was itself on appeal.  In 2005, the appellate court reversed the habeas decision releasing him, and Pelullo returned to prison and is expected to be released in 2016. Pelullo has consistently maintained that he is innocent of all charges against him.  10/25/06 Tr. at 16-17; 8/11/06 Pelullo Dep. at 10-12, 84.

Both Michael Blumenthal and Pelullo disclosed Pelullo's criminal record to the Russacks before they decided to go into business together.  In disclosing his record, Pelullo maintained his innocence.  Despite knowing of Pelullo's criminal history, Ira Russack decided to go into business with him, believing that he was innocent and trusting the judgment of his cousin, Michael Blumenthal.  Ira Russack made this decision together with his brother Harvey.  10/25/06 Tr. at 104-05, 156-57;  10/26/06 Tr. at 8, 10, 22-23; 8/11/06 Pelullo Dep. at 14.

6

B.    <u>The Business Arrangements between R&R and Lyn Merritt</u>

In late 2003, R&R began investing in real estate with Merritt and Pelullo.  All told, R&R invested in six properties in Chester County and three properties in Philadelphia.  In early 2004, R&R began investing in horses with Merritt and Pelullo.  This investment in horses began after R&R invested in a 145 acre property in Brandywine, Pennsylvania.  Pelullo and Merritt told the Russacks that in order to challenge an existing easement on the property and to obtain advantageous tax credits, they needed to have professional horses living on the property.  10/25/06 Tr. at 163-65; 10/26/06 Tr. at 9; 8/11/06 Pelullo Dep. at 20-21.

R&R, Merritt, and Pelullo put six horses on this property in early 2004.  For the Russacks, owning horses introduced them into the horse culture of Southeastern Pennsylvania, which in addition to enjoying for its own sake, they believed offered them access to real estate opportunities.  By the fourth quarter of 2004, R&R, Merritt and Pelullo had between sixty and seventy horses on several farms, including broodmares, foals, race horses, and pleasure horses.  Most of the horses were jointly-owned by R&R and Merritt; a few were owned by Merritt personally.  As the number of horses grew, the purchase prices for them grew more expensive, as did the associated training, transportation, and other costs.  10/25/06 Tr. at 17-18, 119-20, 207-08; 10/26/06 Tr. at 67-68.

As vehicles for their investments in horses and real estate, R&R and Merritt created a number of jointly-owned limited liability companies ("LLCs").  All of these LLCs except one are jointly owned by Merritt and R&R.  The exception is owned by Merritt, R&R, and Pelullo's son.  Pelullo does not have an ownership interest in any of the LLCs.  8/11/06 Pelullo Dep. at 20-21.

One of the LLCs was Pandora Farms, LLC ("Pandora Farms").  It was jointly owned by R&R and Merritt and was a vehicle for purchasing and owning horses.  Capital for Pandora Farms came from both R&R and Merritt, and any payment to the LLC from either owner was usually treated as a capital contribution. 10/25/06 Tr. at 26, 105-07, 147, 209-10; 10/26/06 Tr. at 20.

Merritt is the managing member for all of the jointly-owned LLCs, including Pandora Farms.  Merritt owns a management company called Mer-Lyn Farms, LLC ("Mer-Lyn") that she used to manage the LLCs.  Mer-Lyn is entirely owned by Merritt and the Russacks have no ownership interest in it.  Mer-Lyn handled payroll and other expenses for the LLCs and was authorized to pay expenses on their behalf.  Bills incurred by the LLCs would be paid by Mer-Lyn and then later allocated to the appropriate LLC when the accounts were reconciled.  10/25/06 Tr. at 32, 38, 105-07, 147, 240; 10/20/06 Pelullo Dep. at 21.

8

There is a written agreement between Merritt and R&R governing Mer-Lyn's right to act on behalf of the LLCs. This agreement is in the form of a letter on Mer-Lyn's letterhead, signed by Merritt and countersigned by Ira Russack on behalf of R&R. The letter is dated December 11, 2004, approximately a year after R&R and Merritt began investing together. It states that Mer-Lyn "has been and will continue to provide services and advance funds" on behalf of the LLCs, including Pandora Farms, and specifies that Mer-Lyn can, among other actions, enter into "agreements with and pay vendors, contractors, and suppliers" and "from time to time advance funds" on behalf of the LLCs. The letter states that such services "shall be allocated and charged" to the LLCs without markup or profit. Def. Ex. 11; 10/25/06 Tr. at 240-41; 10/26/06 Tr. at 19-20.

The horses that R&R and Merritt purchased were mostly bought at auction. Merritt or Pelullo would do the bidding at these auctions. If Pelullo did the bidding, he did so on Merritt's behalf. After horses were purchased, the bills for the horses would sometimes come to Mer-Lyn. Mer-Lyn was then authorized to pay the bills, allocate the expense to the appropriate LLC, and then ask R&R to contribute to the purchase price. Although Mer-Lyn was authorized to pay bills and advance money, it was not authorized to purchase assets without R&R's approval. 10/25/06 Tr. at 18-20, 33, 107, 208, 241.

Neither of the Russacks had any substantial expertise with horses before going into business with Pelullo and Merritt. The Russacks relied on Merritt and Pelullo for advice about what horses to buy.  10/25/06 Tr. at 14, 181-82; 10/26/06 Tr. at 48, 56-58.

C.    The Purchase of the Three Pinhooking Horses from Fasig-Tipton

The three horses at issue in this suit are referred to by their parentage.  The three horses are "by Pulpit, out of Lipstick" ("Lipstick/Pulpit"), "by Mr. Greeley, out of Splashing Wave" ("Splashing Wave"), and "by Belong To Me, out of Mambo-Jambo" ("Mambo-Jambo").  These three horses were purchased as pinhooking horses.  Pinhooking horses are young horses that are bought with the intention of training them and then reselling them at a later sale.  The time between purchase and sale for a pinhooking horse is variable and can be between six months and a year.  10/25/06 Tr. at 20-22; 10/26/06 Tr. at 70, 91. Pl. Ex. 1-3.

The three horses were purchased in Sarasota Springs, Florida, at a sale run by Fasig-Tipton, a well-regarded auction house.  Splashing Wave was purchased on August 10, 2004, and Mambo-Jambo and Lipstick/Pulpit were purchased on August 12, 2004.  The horses were purchased by Pelullo, using a consultant named John Servis.  Pelullo did not attend the auction and

instead had Servis bid for him.  10/25/06 Tr. at 21-23, 28-29, 107; 10/20/06 Pelullo Dep. at 23-24.

Prior to the horses being purchased, Pelullo and Ira Russack had a conversation about a budget for the Fasig-Tipton auction.  Ira Russack set a budget of between $500,000 and $600,000.  Ira Russack and Pelullo spoke after the auction, and Pelullo told him what horses had been purchased and their cost. Russack was principally concerned with the cost, rather than the identity of the horses.  10/26/06 Tr. at 26-27; 8/11/06 Pelullo Dep. at 51; 10/20/06 Pelullo Dep. at 22-23.

Trial testimony is conflicting as to whether either of the Russacks was ever told that Pelullo was purchasing pinhooking horses at the auction or whether they were told what entity would be the purchaser.  Harvey Russack testified that he did not learn that pinhooking horses had been purchased at the August 2005 auction until October 2005.  Neither Pelullo nor Merritt testified that they specifically told either Russack that pinhooking horses would be purchased at the auction, although Pelullo testified that he had gone over the names of potential purchases with Ira Russack prior to the sale and told him after the sale which horses had been bought.  Pelullo and Merritt both testified that the pinhooking horses were purchased for Pandora Farms, and Pelullo testified that he had specifically told Ira Russack after the sale that Pandora Farms had been the

11

purchaser.[1]  Both Russacks testified that they did not recall being told that the horses were purchased for Pandora Farms.

Based on this testimony, and considering the credibility of the witnesses and the demeanor of those who testified at trial, the Court finds that the Russacks were not told at the time of the August 2004 auction that Pelullo was purchasing pinhooking horses.  The Court finds that the Russacks were told that the horses to be purchased at the auction were to be allocated to Pandora Farms.  10/25/06 Tr. at 166-67, 212-213; 10/26/06 Tr. at 26-27; 8/11/06 Pelullo Dep. at 34, 51.

The ownership papers for each of the three pinhooking horses consist of a Jockey Club "certificate of foal registration."  The certificate is required in order to sell or race a thoroughbred.  A section of the certificate records any transfer of ownership, and a purchaser ordinarily receives the certificate after paying for the horse.  On each of the Jockey Club certificates for the three pinhooking horses, the identity of the owner to whom the horse is being transferred is written as "Linda Merritt."  Merritt contends that her name appears on the

---

[1]     In support of his assertion that Pandora Farms purchased the horses from Fasig-Tipton, Pelullo testified that Pandora Farms had a credit line with Fasig-Tipton but that Mer-Lyn Farms did not.  8/11/06 Pelullo Dep. at 38.  No corroboration was offered for Pelullo's testimony at trial, and standing alone, the Court finds Pelullo's testimony to be insufficient to make any finding about which entities had or did not have credit lines with Fasig-Tipton.

certificate in error and that the owner should have been listed as Pandora Farms.  Pl. Ex. 1-3; 10/25/06 Tr. at 23-26, 29.

The purchase price for Splashing Wave, excluding miscellaneous fees, was $140,000.  The purchase price excluding fees was $227,000 for Mambo-Jambo and $150,000 for Lipstick/Pulpit.  Pl. Ex. 5, 7; 10/25/06 Tr. at 59-60, 176.

Invoices from Fasig-Tipton were introduced into evidence for Splashing Wave and Mambo-Jambo.  These invoices were dated August 14, 2004, and were addressed to Linda Merritt at Pandora Farms.  No invoice was introduced into evidence for Lipstick/Pulpit.[2]  Although Fasig-Tipton sent invoices for Splashing Wave and Mambo-Jambo in August, these invoices were not paid until October.  The checks to Fasig-Tipton paying the invoices for Splashing Wave and Mambo-Jambo were dated October 12, 2004, signed by Lyn Merritt, and drawn on the account of Mer-Lyn Farms.  Pl. Ex. 5-8; 10/25/06 Tr. at 30-32.

Although Fasig-Tipton was not paid for Splashing Wave until October 2004, on August, 23, 2004, Merritt sent an email to Harvey Russack itemizing expenses incurred by Pandora Farms and

---

[2]     Plaintiff's exhibit 4 is a fax dated August 10, 2004, from Fasig-Tipton to Merritt at Pandora Farms concerning Lipstick/Pulpit.  The fax is entitled a "notice of transfer of registration certificate(s)" and does not state the purchase price for the horse.  A handwritten and undated notation on the fax reads "Harvey paid Fasig-Tipton directly for this filly via wire transfer," which likely refers to the Russacks' October payment for the horse discussed elsewhere.  No testimony was introduced concerning this fax.

requesting that R&R pay half the amount listed.  One of the expenses is $140,000 for "Fasig-Tipton," which Merritt testified referred to the purchase price for Splashing Wave.  Harvey Russack prepared a wire transfer request for Ira Russack's approval,  and on August 24, 2004, Ira Russack authorized a wire transfer from R&R in the requested amount to Pandora Farms.  This amount included $70,000 as half the purchase price of Splashing Wave.  Pl. Ex. 75, 76; 10/25/06 Tr. at 63-64.

The purchase price for Lipstick/Pulpit was paid by a wire transfer from R&R directly to Fasig-Tipton on October 20, 2004.  R&R's payment for Lipstick/Pulpit was part of R&R's purchase of all three pinhooking horses, discussed below.  Pl. Ex. 11; 10/25/06 Tr. at 59-60.

D.    Lipstick/Pulpit's Condition After Purchase

Lipstick/Pulpit was purchased from Fasig-Tipton on August 12, 2004, and delivered by van.  Before being transported, Lipstick/Pulpit and the other horses purchased were checked by a veterinarian and found to be in good health.  Shortly after Lipstick/Pulpit was delivered from Fasig-Tipton, Merritt's employees noticed that she was lame.  Lipstick/Pulpit was rested overnight, but the next day her condition had not improved. Pelullo called a veterinarian, Dr. Reid, to examine the horse. He diagnosed Lipstick/Pulpit as suffering from "laminitis," also

referred to as "foundering."  Laminitis is a rotation of the coffin bone in the foot of a horse, which causes severe pain and can eventually puncture the sole of the foot.  Pelullo asked Dr. Reid to prepare a report.  Pelullo anticipated that the report might be sent to Fasig-Tipton to put them on notice of problems with the horse. 10/25/06 Tr. at 39-40; 10/26/06 Tr. at 71-72; 8/11/06 Pelullo Dep. at 112, 126-27.

On August 15, 2004, Merritt drafted an email to Fasig-Tipton, stating that she was "rejecting the purchase" of Lipstick/Pulpit and that a veterinarian report would follow. This email, which identified Merritt as a representative of Pandora Farms, was misaddressed and was not received by Fasig-Tipton.  On August 23, 2004, Merritt sent Fasig-Tipton an overnight letter on Pandora Farms letterhead, again stating that she was rejecting the purchase of Lipstick/Pulpit and enclosing an August 18, 2004, letter from Dr. Reid describing Lipstick/Pulpit's condition.  Pl. Ex. 12; 10/25/06 Tr. at 39, 51-52.

Dr. Reid's August 18, 2004, letter, addressed "to whom it may concern," said that, upon examination, Lipstick/Pulpit was "markedly lame in both forelimbs with the right worse than the left" but otherwise appeared in good health.  The letter says Dr. Reid ordered radiographs of the horse's front feet which showed slight downward rotation of the coffin bone of the left front

foot, "more noticeable rotation" of the coffin bone in the right
front foot, and other findings "consistent with the diagnosis of
Laminitis."  The letter said the "change in the right foot also
suggests the Laminitis is chronic."  The letter concluded that
"due to the age of the filly, degree of lameness and significant
radiographic changes I feel this filly has a poor prognosis for
racing and a guarded prognosis as a brood mare."  Pl. Ex. 13.

     A representative of Fasig-Tipton replied to Merritt's
letter and Dr. Reid's report in a letter of August 26, 2004,
addressed to Pelullo.  In this letter, Fasig-Tipton noted that
there were strict time limits for lodging objections to purchases
at their sales and that Lipstick/Pulpit was examined on Pelullo's
behalf by a veterinarian after purchase.  Fasig-Tipton says it
has spoken with the original owner of the horse and the original
owner's veterinarian who said the horse was not lame before the
sale and questioned Dr. Reid's suggestion that the horse's
laminitis is chronic.  The letter concludes by suggesting that
Lipstick/Pulpit may have suffered from the rapid onset of
laminitis after the sale and that Fasig-Tipton regards the sale
of Lipstick/Pulpit as final and expects payment in full.  Pl. Ex.
15.

     After Dr. Reid examined Lipstick/Pulpit in August 2004,
he prescribed anti-inflammatory drugs and rest to see if the
horse would recover.  Lipstick/Pulpit was kept on "stall rest"

for August, September, and the first part of October 2004,
meaning she was kept in her stall and not exercised.  On October
8, 2004, Lipstick/Pulpit was examined by veterinarians at the New
Bolton Center of the University of Pennsylvania School of
Veterinary Medicine.  These New Bolton veterinarians sent a
letter to Dr. Reid dated October 12, 2004, reporting on their
examination.  The letter stated that radiographs of
Lipstick/Pulpit's front feet revealed mild rotation of her front
right foot and possible rotation of her left forelimb.  The
letter concluded that Lipstick/Pulpit should continue to wear
glue-on shoes and her feet should be trimmed every four weeks.
Once trimming had "returned the alignment of the distal phalanx
with the dorsal hoof wall and she is sound she may gradually be
introduced to controlled exercise."  Pl. Ex. 16; 10/25/06 Tr. at
54-55; 10/26/06 Tr. at 75-78.

Lipstick/Pulpit remained stall-bound through November
2004.  In December 2004, the horse was again examined at New
Bolton.  The December 15, 2004, letter from the New Bolton
veterinarians to Dr. Reid states that radiographs of
Lipstick/Pulpit's front feet indicate that the hoof balance of
both feet is "remarkably improved" and that she had no evidence
of rotation in the left front foot and 4 degrees of rotation in
the right front foot.  The letter concluded that, "[i]f she is
sound after her next foot trimming she may have shoes placed and

17

be introduced to controlled exercise."  Pl. Ex. 17; 10/26/06 Tr. at 79-80.

After the December 2004 examination, Lipstick/Pulpit was released from stall rest and allowed to be loose for 30-40 minutes a day in a sand paddock that reduced the chance of her re-injuring her feet.  By early January 2005, Lipstick/Pulpit had sufficiently recovered that she was able to be sent to Florida to be trained.  By the spring of 2005, Lipstick/Pulpit was sufficiently recovered to be able to run training sprints of an eighth or sixteenth of a mile.  10/26/06 Tr. at 80-83, 93.

E.   R&R's Agreement to Purchase the Pinhooking Horses and the Representations Made to the Russacks at the Time of Purchase

In September or October of 2004, the Russacks decided they no longer wanted to invest in horses, particularly racehorses.  The Russacks were concerned that they had spent a large amount of money on horses and were not receiving an adequate rate of return on their capital.  Ira Russack was also concerned about the intrusive licencing requirements to which he would be subjected if he continued to own and race thoroughbred racehorses.  In October 2004, the Russacks approached Pelullo and Merritt to discuss having them purchase R&R's ownership stake in their jointly-owned racehorses.  10/25/06 Tr. at 27, 168-69, 205; 10/26/06 Tr. at 13, 33-34; 8/11/06 Pelullo Dep. at 24.

18

In October 2004, Pelullo and Ira Russack negotiated a deal to have Merritt buy out R&R's interest in the approximately 21 race horses owned by R&R and Merritt.  Under the deal, R&R would remain invested in the broodmares and steeple-jumping horses owned by Merritt and R&R, but Merritt would purchase R&R's interest in the racehorses for the amount that R&R had contributed toward the racehorses' purchase price and expenses. As part of the overall deal, Pelullo proposed that R&R purchase the three pinhooking horses.  10/25/06 Tr. at 168-70; 10/26/06 Tr. at 39-40; 8/11/06 Pelullo Dep. at 27.

### 1.   The Purchase Price of the Pinhooking Horses

Although the parties disagree about the details of the deal and about what representations were made to the Russacks concerning the purchase of the three pinhooking horses, they agree on the fundamental terms of the purchase.  Both sides agree that R&R was to buy the pinhooking horses at the same price that the horses were bought from Fasig-Tipton:  $140,000 for Splashing Wave, $227,000 for Mambo-Jambo, and $150,000 for Lipstick/Pulpit. Both sides also agree that the parties contemplated that the three horses would be trained for several months and then sold at a profit in the spring of 2005.  10/25/06 Tr. at 168-72, 176; 10/26/06 Tr. at 12, 39, 43-44; 8/11/06 Pelullo Dep. at 36.

    2.   The "Guaranteed" Profit

        The parties disagree about whether Pelullo guaranteed
that R&R would make a profit on the eventual sale of the
pinhooking horses.  Both of the Russacks characterize the offer
to purchase the pinhooking horses as additional compensation for
their being bought out of the race horses.  They say that Pelullo
offered them the pinhooking horses as a "personal favor" and that
they could be resold in the first quarter of 2005 for a
"guaranteed," "slam dunk" profit.  Harvey Russack testified that
Pelullo offered to make R&R whole if the deal lost money.
10/25/06 Tr. at 168-69, 173, 175; 10/26/06 Tr. at 12.

        Pelullo characterizes the deal as a division of the
horses owned by Pandora Farms, with Merritt agreeing to purchase
the race horses (possibly funded by an advance from R&R) and R&R
agreeing to purchase the pinhooking horses.  Pelullo denies that
he ever guaranteed that R&R would make a profit on the pinhooking
horses although he admits he told the Russacks they should be
able to "make a few bucks."  8/11/06 Pelullo Dep. at 27-28, 82;
10/20/06 Pelullo Dep. at 64-65.

        The Court finds that Pelullo told the Russacks that the
pinhooking horses would be a profitable deal for them, but that
he did not guarantee a profit.

3.   R&R's Responsibility for Previously Incurred
     Expenses of the Pinhooking Horses

The parties dispute whether R&R's agreement to purchase the pinhooking horses included an agreement to assume responsibility for the horses' previous expenses.  Pelullo testified that as part of its purchase of the pinhooking horses, R&R agreed that it would become responsible for all of the previous expenses incurred by the three horses from the time they were purchased from Fasig-Tipton to the time they were bought by R&R.  10/20/06 Pelullo Dep. at 6-7.

Both Harvey and Ira Russack deny that they ever agreed to be responsible for previous expenses incurred before R&R bought the horses.  Harvey Russack testified Pelullo never told them they were to be responsible for these costs.  He testified that his handwritten notes memorializing a conversation with Pelullo about expenses for these horses appear to indicate that R&R paid money toward expenses incurred in September 2004 and October 2004, before R&R purchased the horses, but he does not know why those expenses were paid.  Ira Russack, when asked whether his agreement to have R&R purchase the pinhooking horses included a provision that R&R would be responsible for costs already incurred, testified that he had signed no agreement to that effect and that therefore "it's not true."  Pl. Ex. 39; 10/25/06 Tr. at 172, 220-22; 10/26/06 Tr. at 43.

21

The principal evidence that R&R had agreed to assume the costs is Pelullo's deposition testimony.  Pelullo's testimony on this point, however, is undercut because he first testified in his August 2006 deposition that Pandora Farms, not R&R, would be responsible for costs incurred before R&R purchased the horses. He then corrected this testimony at his second deposition in October 2006, saying that he had misunderstood the question and that Pandora Farms would have been responsible before R&R assumed responsibility for those costs under the agreement.  8/11/06 Pelullo Dep. at 55-56; 10/20/06 Pelullo Dep. at 6-7.

Harvey Russack's concession that R&R may have paid at least some of the horses' expenses incurred in September and October 2004 does not establish that R&R agreed to assume responsibility for these expenses.  The testimony at trial established that Merritt and Pelullo's requests to R&R for funding were often informal and poorly documented.  The fact that R&R was asked to pay these expenses, and did so, does not necessarily mean that R&R was obligated to do so.

Weighing this evidence and testimony, the Court finds that the Russacks did not agree to assume responsibility for any costs for the three pinhooking horses that were incurred prior to R&R's purchase.

22

4.   Representations About the Ownership of the Horses
     Before Being Sold to R&R

The parties dispute what the Russacks were told about
who owned the pinhooking horses that R&R was purchasing.  Harvey
Russack testified that Pelullo told him that the horses were
owned by Merritt and, from this, he understood that they were
owned by her or by her company, Mer-Lyn Farms.  Ira Russack
testified that he believed the horses were owned by Merritt and
Pelullo.  10/25/06 Tr. at 172, 192, 212; 10/26/06 Tr. at 12.

Pelullo and Merritt testified that the horses were
owned by Pandora Farms when R&R purchased them.  Pelullo
testified that he discussed the purchase of the pinhooking horses
with Ira Russack both immediately before and immediately after
the Fasig-Tipton auction in August 2004 and discussed with him
that the horses purchased were going to be allocated to Pandora
Farms.  Neither Merritt nor Pelullo, however, testified that they
told the Russacks in October that R&R was purchasing the horses
from Pandora Farms.  10/25/06 Tr. at 37; 8/11/06 Pelullo Dep. at
33-34.

The Court resolves this dispute as to what the Russacks
knew or were told about the ownership of the pinhooking horses
when they were purchased by R&R in favor of the Russacks.  The
Court finds credible the Russacks' testimony that they were not
told, and did not believe, that the horses were owned by Pandora
Farms at the time R&R purchased them.  Instead, the Court finds

23

that the Russacks were told by Pelullo, and reasonably believed, that the horses were owned by Merritt.

This finding is not contradicted by the Court's prior finding (Section I.C., above) that Pelullo told the Russacks in August 2005 that the horses being purchased at the Fasig-Tipton auction would be allocated to Pandora Farms.  Given the number of horses being purchased in 2004, the Court finds that neither Ira or Harvey Russack realized that the horses purchased by Pandora Farms in August were the pinhooking horses R&R was purchasing in October.[3]

### 5.   Lack of Disclosure of the Condition of Lipstick/Pulpit

The parties disagree as to what the Russacks were told about the condition of Lipstick/Pulpit.  As set out in section I.D. above, at the time of the October 2004 negotiations, Lipstick/Pulpit had been found to be lame after being delivered from the Fasig-Tipton auction, had been seen in August 2004 by Dr. Reid, and had been diagnosed with laminitis;  Merritt had written Fasig-Tipton in August 2004 seeking to reject the

---

[3]      The Court notes as corroboration that, had the Russacks realized that the pinhooking horses that R&R was buying in October were the same horses purchased in August for Pandora Farms, they would also have realized that Ira Russack had already reimbursed Pandora Farms for half of the purchase price for one of the horses, Splashing Wave, and so would not have paid the full purchase price for that same horse when R&R bought it in October.

purchase of Lipstick/Pulpit, and Fasig-Tipton had refused; and Lipstick/Pulpit had been placed on stall rest and seen by veterinarians at New Bolton in early October 2004.

The Russacks testified that they were never told that Lipstick/Pulpit was lame or on stall rest at the time they purchased her.  The Russacks also testified that they were never told Merritt had tried to reject the purchase of Lipstick/Pulpit. They testified that they never saw or received copies of Merritt's letter to Fasig-Tipton or the August letter report of Dr. Reid or the October or December reports of the New Bolton veterinarians.  The Russacks testified that Pelullo described the three pinhooking horses to them as good horses that could be sold at a profit and that they had no reason to believe that Lipstick/Pulpit was in anything other than good condition.  Both Russacks testified they only learned that Lipstick/Pulpit had been lame after this suit was filed.  Harvey Russack testified that they would not have had R&R buy Lipstick/Pulpit had they known of its condition at the time of sale. 10/25/06 Tr. at 168, 175-80, 182; 10/26/06 Tr. at 14, 16-17, 46-47.

Merritt testified that she did not tell the Russacks that Lipstick/Pulpit was lame, nor did she send them copies of her August letter to Fasig-Tipton or the August letter of Dr. Reid or the October and December letters of the New Bolton veterinarians.  She testified that she believed Pelullo had told

Ira Russack about Lipstick/Pulpit being lame, but admitted that she had no personal knowledge of any such conversation or any documentation of any written communication to the Russacks about the subject.  10/25/06 Tr. at 43-49, 52-53, 142-43.

Pelullo testified that he told the Russacks about the problems with Lipstick/Pulpit both after the sale and after the attempt to return the horse to Fasig-Tipton.  He also believes that he spoke with the Russacks about the October letter from the New Bolton veterinarians.  Pelullo testified that he took notes of discussions with the Russacks at the time R&R was purchasing the horses, which contain the notation "Pulpit, 150,000, LP."  He testified that "LP" referred to Leonard Pelullo and indicated that Lipstick/Pulpit would be in his care, rather than being trained, which he said indicated that he had told the Russacks that Lipstick/Pulpit was lame.  Pelullo testified that he definitely recalled discussing the December New Bolton report with the Russacks.  10/20/06 Pelullo Dep. at 47-48, 53-58, 63-64, 65-66.[4]

---

[4]     At trial, Merritt produced evidence concerning another horse named Menifee that also arrived lame after being purchased. Both parties agree that the Russacks were told about Menifee's condition.  10/25/06 Tr. at 138-142, 147, 232-33.  Merritt argues that the fact that the Russacks were told about Menifee supports an inference that the Russacks were similarly told about Lipstick/Pulpit's condition.  As factfinder, the Court does not find the evidence about Menifee relevant or probative to determining what the Russacks were told about Lipstick/Pulpit.

Pelullo also testified that he "might have" told the Russacks that the three pinhooking horses were "the three best yearlings" they could purchase.  He said he did not consider Lipstick/Pulpit to be suffering from a medical problem at the time of the October 2004 sale of the horse to R&R.  Instead, Pelullo viewed the horse as suffering only a temporary ailment. 8/11/06 Pelullo Dep. at 113-14; 10/20/06 Pelullo Dep. at 64.

The Court resolves this factual dispute in favor of the Russacks, finding their testimony to be more credible than that of Merritt or Pelullo.  The Court finds that the following facts were not disclosed to the Russacks at the time they agreed to have R&R purchase Lipstick/Pulpit:  the fact that Lipstick/Pulpit was found to be lame after she arrived from Fasig-Tipton; the fact that Merritt wrote Fasig-Tipton seeking to rescind the horse's purchase and that Fasig-Tipton refused to rescind the sale; the fact that Lipstick/Pulpit was examined by Dr. Reid in August 2004 and the results of his examination as set out in his August 18, 2004, letter; the fact that Lipstick/Pulpit was examined by the New Bolton veterinarians in October 2004 and the result of that examination as described in their letter of October 8, 2004.

6.   R&R's Payment for the Pinhooking Horses

On October 18, 2004, Pelullo sent a fax to Harvey Russack on Merritt Litigation Support, Inc. letterhead requesting that R&R wire $367,000 to Mer-Lyn Farms in payment for Mambo-Jambo and Splashing Wave.  Ira Russack wired that amount to Mer-Lyn on October 20, 2004.  At this time, Mer-Lyn had paid Fasig-Tipton for both Mambo-Jambo and Splashing Wave, but had not yet paid Fasig-Tipton for Lipstick/Pulpit.  Merritt and Pelullo had not paid Fasig-Tipton for Lipstick/Pulpit by October 2004 because they were holding back the money as leverage to pressure Fasig-Tipton to resolve their complaint about Lipstick/Pulpit's lameness.  The Russacks were therefore told to wire their payment for Lipstick/Pulpit directly to Fasig-Tipton.  Ira wired $150,000 to Fasig-Tipton for Lipstick/Pulpit on October 18, 2004.  Pl. Ex. 9, 10, 11; 10/25/06 Tr. at 34-36, 59-60; 10/26/06 Tr. at 15; 10/20/06 Pelullo Dep. at 37-38.

Both parties agree that, with its wire payments for the horses, R&R became the 100% owner of the three pinhooking horses.

Merritt testified that the $367,000 wired to Mer-Lyn Farms for Mambo-Jambo and Splashing Wave was allocated to Pandora Farms and that this would have been documented on the 2004 financial statements that she prepared.  These 2004 financial statements were not introduced at trial.  Pelullo testified that R&R's previous August 24, 2004, payment of $70,000 to Pandora

Farms for 50% of Splashing Wave would have been credited as a capital contribution to Pandora Farms, but no documentation of any such credit was produced at trial.  10/25/06 Tr. at 33-4; 10/20/06 Pelullo Dep. at 30-32, 35, 38-40.

      F.    Training the Pinhooking Horses and Attempting to Sell
           Them After Their Purchase by R&R

After R&R purchased the three pinhooking horses, the horses remained under the management and care of Pelullo and Merritt.  Splashing Wave and Mambo-Jambo were put into training in the fall of 2004.  Lipstick/Pulpit's training was delayed by her recovery from her lameness, but she began training in January 2005 in Florida.  Pl. Ex. 6 at 1, 7 at 1; 10/26/06 Tr. at 82-83; 10/20/06 Pelullo Dep. at 56-57.

Splashing Wave and Mambo-Jambo were put up for sale in March 2005 at a Fasig-Tipton auction in Miami.  Splashing Wave was withdrawn from sale before the auction.  Mambo-Jambo was put up for sale but failed to receive any bids higher than its reserve and so was not sold.  10/25/06 Tr. at 74-78, 199; 10/26/06 Tr. at 85-87; 10/20/06 Pelullo Dep. at 78-80.

Lipstick/Pulpit was put up for auction in May 2005, but failed to sell.  At the auction, an offer to buy Lipstick/Pulpit for $90,000 or $95,000 was made, but Pelullo, who was handling the horse at auction, rejected it.  The parties disagree whether either of the Russacks were told of the offer or authorized its

rejection.  10/25/06 Tr. at 200; 10/26/06 Tr. at 82-85; 8/11/06
Pelullo Dep at 69-70; 10/2006 Pelullo Dep. at 85.

Pelullo told the Russacks in May or June 2005 that he
was attempting to sell the pinhooking horses to a Kuwaiti sheik,
but no offer materialized.  There was a subsequent offer to
purchase Splashing Wave for $45,000 in the fall of 2005.  Merritt
passed the offer to Ira Russack, who rejected it.  After July
2005, the three pinhooking horses were no longer in training.
10/25/06 Tr. at 69-70, 127-28, 130-31, 196.

G.   Expenses for the Pinhooking Horses after R&R's Purchase

When R&R purchased the pinhooking horses in October
2004, the Russacks and Pelullo contemplated that the horses would
be sent to training for four to six months and then would be sold
in the spring of 2005.  Around the time R&R purchased the horses,
the Russacks and Pelullo discussed a training budget for the
horses of $40,000 or $41,000, which would allow the horses to be
sold by April 2005.  In a subsequent conversation, Pelullo told
Harvey Russack that there would be additional expenses for
pinhooking horses, above the $40,000-41,000 he had estimated.
These additional expenses would be $8,644 for September, October,
and November 2004 and $6,480 for December 2004 and January 2005,
for a total of $15,124.  It is unclear what these additional
expenses were for.  R&R wired $15,124 to Mer-Lyn on December 14,

2004, in payment of the additional expenses requested.  R&R wired $40,000 on March 22, 2005, which R&R's counsel suggests was a payment toward the estimated training expenses for the pinhooking horses.  Neither of these two payments is recorded on Mer-Lyn's books.  Pl. Ex. 39 at R177, Pl. Ex. 59 at R273-74; 10/25/06 Tr. at 171, 186-90, 220-222; 10/26/06 Tr. at 39, 43-44; 10/20/06 Pelullo Dep. at 58.

Bills for the pinhooking horses' expenses, including bills for trainers, transportation, and auction fees, were sent by vendors to Mer-Lyn, which was responsible for paying them. Mer-Lyn would then seek reimbursement for these bills from R&R. Merritt sent requests for reimbursement and documentation of the bills to R&R periodically.  The earliest reimbursement request admitted into evidence is dated July 26, 2005, but Merritt testified that she had sent earlier reimbursement requests beginning in late 2004.  Def. Ex. 10; 10/25/06 Tr. at 110-13.

The Russacks did not expect to pay room and board for the pinhooking horses for any time the horses spent at the jointly-owned farms in Pennsylvania.  They anticipated that prior to sale, the horses would be with a trainer whose fee would include room and board.  To the extent the horses spent time at the jointly-owned farm, the Russacks did not anticipate having to pay rent because Merritt kept several of her personally-owned

horses on the property and she was not charged rent.  10/25/06
Tr. at 181, 185-86, 190-91.

Pelullo and Merritt both testified that they thought
R&R would have to pay a pro rata share of the overhead expenses
for the pinhooking horses for any time that they stayed on
jointly-owned property.  Pelullo conceded that he did not think
the parties intended for R&R to be charged a daily rate for the
pinhooking horses when they were on the property, but he thought
they would be charged a pro rata share of costs for feed,
electricity and other expenses.  Merritt testified that she
expected to be reimbursed for expenses incurred by the pinhooking
horses, and at first attempted to calculate those bills by
dividing costs pro rata, but later calculated those costs by
estimating a per diem rate for expenses.  10/25/06 Tr. at 110,
114-15; 10/20/06 Pelullo Dep. at 54-55.

No bill for room and board or overhead expenses for the
pinhooking horses was submitted to R&R until after this suit was
filed.  None of the reimbursement requests submitted as evidence
at trial contains a request for payment of room and board or
overhead expenses.  The first itemization of these expenses that
appears in the evidence presented at trial is in spreadsheets
prepared for this litigation by Merritt in mid-2006 to itemize
her damages.  Def. Ex. 5, 6, 7, 10; 10/25/06 Tr. at 112-118;
10/20/06 Pelullo Dep. at 97-98.

The total amount that Merritt contends she is owed for the care, training, and maintenance of the pinhooking horses, up to the date of trial, is set out in three spreadsheets, one for each horse.  Merritt lists expenses for the horses from August 2006 through October 2006, including a per diem charge for each day spent on jointly-owned property for feed, hay and straw and employee time.  Merritt itemizes $34,355.48 in unreimbursed expenses for Lipstick/Pulpit, $31,905.84 for Mambo-Jambo, and $25,766.47 for Splashing Wave, for a total of $92,027.79.  Def. Ex. 5, 6, 7.

H.   The End of the Working Relationship between R&R and Merritt

By May or June 2005, the Russacks had begun to lose confidence in Pelullo and Merritt and had begun to express dissatisfaction with the way that their investments were being managed.  At the end of June 2005, Pelullo was required to return to prison on one of his criminal convictions.  After Pelullo returned to prison, the Russacks expressed concerns to Merritt about how she would manage their joint-ventures in Pelullo's absence.  The Russacks offered to take a more active role in their investments and "co-manage" with her.  Merritt was not receptive to the Russacks' suggestion.  At this same time, in June or July 2005, the Russacks stopped funding their joint ventures with Merritt and began to press for an accounting.

33

Accountants working for R&R went over Merritt's books in July 2005.  10/25/06 Tr. at 18-19, 120, 183, 194-95, 201-03; 10/26/06 Tr. at 58, 108.

In November 2005, R&R filed suit in New York, accusing Merritt of fraud, seeking an accounting and the removal of Merritt as the managing member of the jointly-owned LLCs.  R&R Capital LLC, et al. v. Merritt, Index No. 604080/05 (N.Y. Supreme Ct.); 10/25/06 Tr. at 201, 219.  By no later than January 2006, R&R had requested that Merritt turn over possession of the three pinhooking horses.  Merritt responded in a letter of January 30, 2006, that she would turn over the horses after R&R paid the outstanding unreimbursed expenses for the horses.

On April 7, 2006, Merritt sent a letter to the Russacks, threatening to sell the horses to recoup the outstanding unreimbursed expenses that she contended R&R owed.  Pl. Ex. 70.  On April 14, 2006, R&R filed this suit, seeking the return of the three pinhooking horses and an injunction preventing their sale.  On April 17, 2006, the Court enjoined Merritt from selling or otherwise disposing of the horses until the resolution of this action.  Merritt then filed an answer containing a counterclaim against R&R to recoup the costs she allegedly expended on the care of the pinhooking horses.  R&R then sought leave to amend their complaint to add a claim for the rescission of its purchase of Lipstick/Pulpit.

34

The Court held a bench trial on October 25 and 26, 2006, on R&R's claims and Merritt's counterclaim.  On August 19, 2008, R&R filed a motion for contempt against Merritt alleging that Merritt had violated this Court's Order against disposing of the horses during the pendency of this litigation. On January 9, 2009, R&R filed a supplemental motion for contempt alleging additional violations of the Court's Order.

## II.  Conclusions of Law

The claims tried to the Court in this matter were plaintiff R&R's claim for replevin of Splashing Wave and Mambo-Jambo, R&R's claim for the rescission of its purchase of Lipstick/Pulpit, and Merritt's counterclaim for unreimbursed expenses for the care and maintenance of the horses.   The Court finds for R&R on its rescission claim and will order R&R to return ownership of Lipstick/Pulpit to Merritt, and order that Merritt refund to R&R Lipstick/Pulpit's $150,000 purchase price.

Because R&R's pending motions for contempt seek to strike Merritt's counterclaim for expenses for Splashing Wave and Mambo-Jambo, and suggests that R&R may no longer be seeking replevin for either horse, the Court will make findings as to Merritt's counterclaim and R&R's claim for replevin, but will not enter a verdict on those claims, pending resolution of the motions for contempt.   The Court finds for Merritt on her

counterclaim in the amount of $28,432.76.  On R&R's replevin claim, the Court finds that Merritt had a possessory lien on Splashing Wave and Mambo-Jambo in the amount of her $28,432.76 counterclaim, but finds that R&R would be entitled to a conditional verdict on its replevin claim for those horses, upon satisfaction of the counterclaim.

In analyzing the claims, the Court will address them out-of-order, first addressing R&R's claim for rescission of its purchase of Lipstick/Pulpit, then Merritt's counterclaim for unpaid bills, and finally R&R's claim for replevin.

A.   <u>Rescission of the Contract to Buy Lipstick/Pulpit</u>

R&R seeks to rescind its contract to purchase Lipstick/Pulpit, alleging that Merritt and Pelullo fraudulently concealed the fact that the horse had been diagnosed with laminitis and that Merritt had sought to rescind the original purchase of the horse from Fasig-Tipton.

1.   <u>R&R is Entitled to Rescission.</u>

Under Pennsylvania law, when a party is induced to enter a transaction by means of fraud or a material misrepresentation, the transaction is voidable at the option of the innocent party.  <u>In re Allegheny Int'l, Inc.</u>, 954 F.2d 167, 178 (3d Cir. 1992);  <u>Bortz v. Noon</u>, 729 A.2d 555, 564-65 (Pa.

1999); College Watercolor Group, Inc. v. William H. Newbauer, Inc., 360 A.2d 200, 206 (Pa. 1976); Crummer v. Berkman, 499 A.2d 1065, 1066 (Pa. Super. Ct. 1985).  A party seeking to void a contract can do so either by establishing that it was induced to enter the contract by a fraudulent misrepresentation, whether or not that misrepresentation was material, or that it was induced to enter the contract by a material misrepresentation, even if that misrepresentation was made innocently.  Bortz, 729 A.2d at 564 (citing DeJoseph v. Zambelli, 139 A.2d 644 (Pa. 1958)).

A misrepresentation is an "assertion not in accordance with the facts."  College Watercolor, 360 A.2d at 206 (citing Restatement (First) of Contracts § 470).  Non-disclosure of a fact may amount to a misrepresentation where disclosure of the fact is necessary to prevent some previous assertion from being a misrepresentation or from being fraudulent or material.  In re Allegheny, 954 F.2d at 178 n.10 (citing Restatement (Second) of Contracts § 161).  A misrepresentation is fraudulent if the maker intends his assertion to induce a party to manifest his intent, and the maker either "knows or believes that the assertion is not in accord with the facts or . . . knows that he does not have the basis that he states or implies for the assertion."  Id. at 178 n.8 (citing Restatement (Second) of Contracts § 162).  A misrepresentation is material if it would be likely to induce a

37

reasonable person to manifest his assent, or if the maker knows that it would be likely to induce the recipient to do so.   Id.

Here, the Court finds that R&R was induced to purchase Lipstick/Pulpit on the basis of statements by Pelullo and Merritt that were both fraudulent and material.  Pelullo, who was Merritt's employee and who handled the details of the sale for her, told the Russacks that the three pinhooking horses that R&R was purchasing were "the three best yearlings" that they could purchase, even though Pelullo knew that Merritt had attempted to return Lipstick/Pulpit to Fasig-Tipton on the basis of Dr. Reid's diagnosis of laminitis.  Neither Pelullo or Merritt disclosed to the Russacks that Merritt had sought to return the horse, or disclosed that the horse was lame, or disclosed the August 2004 report of Dr. Reid or the New Bolton veterinarians' October 2004 report.  In these circumstances, the statement that Lipstick/Pulpit was one of the best horses available was a knowing misstatement not in accord with the facts and therefore fraudulent.

The failure to tell the Russacks of the attempt to return Lipstick/Pulpit, the horse's lameness, or the veterinarians' reports were themselves misstatements by omission because their disclosure was necessary to prevent Pelullo's statement about the horses being the "best" from being misleading.  The Court finds all of these misstatements to be

38

material because they would be likely to induce a reasonable person to buy Lipstick/Pulpit and because the Court finds that Merritt and Pelullo knew that these misstatements were likely to induce R&R to buy Lipstick/Pulpit.  The Court finds that the Russacks reasonably relied on these misrepresentations in deciding to have R&R purchase Lipstick/Pulpit.

Merritt argues that her failure to disclose these facts about Lipstick/Pulpit did not amount to fraudulent or material omissions because the horse was not suffering from laminitis and so there was nothing material to disclose.  Merritt argues that the diagnosis of laminitis in Dr. Reid's report is hearsay and that R&R has produced no expert testimony to establish that Lipstick/Pulpit suffered from laminitis.  Absent such expert testimony, Merritt argues that all R&R has established is that Lipstick/Pulpit had some physical problems after delivery, of the sort that all horses at some time develop.  10/26/06 Tr. at 133-37.

Merritt's argument is unpersuasive for several reasons. First, whether or not Lipstick/Pulpit actually suffered from laminitis after it arrived from the Fasig-Tipton sale, Merritt herself found the horse's condition serious enough to write Fasig-Tipton seeking to return the horse.  The failure to disclose that the horse suffered from such a serious condition, whether or not it amounted to laminitis, as well as the failure

39

to disclose that Merritt sought to rescind the sale, were material misstatements.  Similarly, whether or not Dr. Reid's diagnosis of laminitis was correct, the fact that such a diagnosis had been made was material to a reasonable purchaser. Both Dr. Reid's report and the report of the New Bolton veterinarians should have been disclosed to the Russacks.

> 2.   The Remedy for Rescission is the Refund of the
>      <u>Purchase Price in Return for Tender of the Horse</u>

Having found that R&R was induced to buy Lipstick/Pulpit by a fraudulent and material misstatement, R&R is entitled to a rescission of the contract.  Rescission is essentially the "unmaking of a contract," meaning it is not merely a termination of the parties' rights and obligations under the contract, but also an abrogation of the parties' rights and responsibilities towards each other from the contract's inception.  <u>Keenheel v. Commonwealth</u>, 579 A.2d 1358, 1361 (Pa. Commw. Ct. 1990).  The purpose of an equitable rescission is to return the parties as nearly as possible to their original positions with respect to the subject matter of the contract. <u>Id.</u> (citing <u>Sullivan v. Allegheny Ford Truck Sales</u>, 423 A.2d 1292 (Pa. Super. Ct. 1980)).  The party seeking rescission of a contract of sale must therefore be willing to return the property at issue.  <u>Id.</u>

Here, R&R seeks a return of the $150,000 that it paid for Lipstick/Pulpit. In its amended complaint, R&R also seeks a refund of money it alleges it spent on the care of the horse. At trial, however, R&R did not establish that it made any particular payments for Lipstick/Pulpit's care. The Court therefore finds that R&R is only entitled on its rescission claim to a refund of Lipstick/Pulpit's $150,000 purchase price.

In order for the parties to be returned to the status quo ante, before receiving a refund of its $150,000 purchase price, R&R must surrender its ownership of Lipstick/Pulpit. The Court will therefore enter a conditional verdict on this claim, ordering restitution of the $150,000 purchase price upon R&R's tendering its ownership of the horse.

3. Merritt is the Seller of Lipstick/Pulpit and the Party from whom R&R is Entitled to Rescission.

During the bench trial, the Court raised with the parties the question of which entity sold Lipstick/Pulpit to R&R in October 2004. The Court suggested that, if it were to order rescission of the sale, it would need to determine the identity of the seller before ordering a refund of the horse's purchase price. Merritt took the position that the entity which bought the horse from Fasig-Tipton and sold it to R&R was Pandora Farms. R&R suggested that the issue need not be addressed, but argued

that R&R bought Lipstick/Pulpit from Merritt, acting through her wholly-owned company Mer-Lyn Farms.

The Court finds that, in order to award rescission, it must determine which entity sold Lipstick/Pulpit to R&R. The Court finds, by a preponderance of the evidence, that the seller was Merritt. As set out in the Court's findings of fact, when R&R purchased the three pinhooking horses, Pelullo had told the Russacks, and the Russacks reasonably believed, that the horses were owned by Merritt. Merritt's name was on the ownership papers for the horses, and R&R's check for Splashing Wave and Mambo-Jambo was made out to Merritt's company, Mer-Lyn Farms. R&R's payment for Lipstick/Pulpit was made, at Merritt and Pelullo's direction, by a wire transfer to Fasig-Tipton to pay for the original purchase price of the horse. Based on this evidence, the Court finds that the party from whom R&R contracted to buy the horses was Merritt.

Merritt has argued that she could not be the seller because she did not own any of the three horses. She contends that the horses were all purchased from Fasig-Tipton by the jointly-owned LLC Pandora Farms, and as such, Pandora Farms was the entity that sold the horses to R&R.

As an initial matter, even if Pandora Farms had purchased Lipstick/Pulpit from Fasig-Tipton and was its owner at the time the horse was sold to R&R, this does not mean that

Pandora Farms must be the seller.  Having found that Merritt's employee and agent Pelullo represented that Merritt owned the three pinhooking horses and that the Russacks reasonably believed they were buying the horses from her, the Court could find that Merritt was the seller even if it also found that Pandora Farms owned the horses.  Merritt would simply have sold horses that she did not own.  The Court, however, does not reach this conclusion and instead finds that Lipstick/Pulpit was owned by Merritt's company, Mer-Lyn Farms, at the time it was sold by Merritt to R&R.

The evidence as to the actual ownership of the three pinhooking horses at the time of their sale to R&R is conflicting.  The horses' ownership papers prepared after the Fasig-Tipton sale indicate Merritt as their owner.  Merritt's correspondence with Fasig-Tipton about rejecting the purchase of Lipstick/Pulpit is written on Pandora Farms' letterhead.  The invoices sent by Fasig-Tipton for Splashing Wave and Mambo-Jambo are made out to Pandora Farms.  The payment for those invoices, however, was made by Mer-Lyn Farms.  Mer-Lyn Farms was then reimbursed for this payment by R&R when it purchased the horses.  No Fasig-Tipton invoice for Lipstick/Pulpit was produced at trial and no payment was made for the horse until R&R wired the purchase price to Fasig-Tipton at Merritt's direction as part of its purchase of the horses.

Considering this evidence together, the Court finds that the horses were bought by Mer-Lyn Farms, with the intention that the horses and their purchase price would be later allocated to Pandora Farms.  Both under the parties' written agreement (entered into after the horses were purchased) and their previous course of conduct, Mer-Lyn was empowered to make purchases and advance funds on behalf of the jointly-owned LLCs.  These purchases and advances would later be allocated to the appropriate LLC when the accounts were reconciled.  Here, this apportionment may have been done with respect to one of the horses, Splashing Wave.  Within two weeks of the Fasig-Tipton auction, Merritt wrote Harvey Russack, requesting that R&R pay half the purchase price for Splashing Wave, describing this as an expense incurred by Pandora Farms.  R&R then paid the requested amount to Pandora Farms.  (As discussed elsewhere, the Fasig-Tipton invoice for Splashing Wave was later paid by Mer-Lyn Farms, which was then reimbursed for the entire purchase price by R&R as part of its purchase of the horse).  With respect to Lipstick/Pulpit, however, there is no documentation that the horse was ever apportioned to Pandora Farms.

From these facts, the Court finds that Lipstick/Pulpit was bought by Mer-Lyn Farms from Fasig-Tipton but never apportioned to Pandora Farms.  The horse was therefore owned by

Mer-Lyn at the time of its sale to R&R.[5]  Merritt as Mer-Lyn's sole owner could therefore enter into a contract to sell the horse and have Mer-Lyn deliver title to the horse to R&R.

Having found that R&R is entitled to rescission of its purchase of Lipstick/Pulpit and that R&R bought the horse from Merritt, the Court will order R&R to tender ownership of Lipstick/Pulpit to Merritt and will order Merritt, upon that tender, to return to R&R the $150,000 purchase price for the horse, less the amount awarded to Merritt on her counterclaim, as set out below.

B.    Merritt's Counterclaim for Unpaid Expenses

Merritt has asserted a counterclaim for expenses that Mer-Lyn Farms paid for the care, training, and maintenance of the three pinhooking horses.  The principal components of these expenses are unreimbursed amounts paid to third-party vendors.  R&R has not disputed that these third-party bills were incurred or that their amounts are fair and reasonable.  Instead, R&R has principally argued that any amount owed Merritt for the horses' expenses should be set off by payments that R&R made to Mer-Lyn

---

[5]    In finding that Lipstick/Pulpit was owned by Mer-Lyn when the horse was sold to R&R, the Court is not making any finding as to the ownership of Splashing Wave or Mambo-Jambo at that time.  Because neither Splashing Wave nor Mambo-Jambo is the subject of R&R's rescission claim, such a finding is not necessary to resolve the issues before the Court.

or the LLCs.  10/26/06 Tr. at 126-29.  After examining R&R's
arguments, the Court finds that none of R&R's proposed set-offs
can reasonably be applied here.  The Court also finds, however,
that not all of Merritt's claimed expenses may be charged to R&R
under the terms of the parties' agreement as found by the Court.


    1.  R&R's Claimed Set-Offs to Merritt's Counterclaims

        R&R argues that Mer-Lyn Farms' general ledger for
January 31, 2005, through the end of August 2005, shows that the
Russacks had a credit in the amount of $1,162,085.64, over and
above any of Mer-Lyn's expenses.  R&R argues that any amount owed
on Merritt's counterclaim should be set off against this credit,
and so R&R should owe Merritt nothing.  10/25/06 Tr. at 87-89;
10/26/06 Tr. at 126-27.  The Court finds that determining whether
or not R&R is entitled to the credit claimed is beyond the scope
of this litigation and is properly the subject of R&R's New York
lawsuit for an accounting.

        R&R also argues that it should be granted a set off for
the $70,000 payment it made to Pandora Farms in August 2004 for
half the purchase price of Splashing Wave.  At Merritt's
direction, R&R later paid the entire $140,000 purchase price for
Splashing Wave to Mer-Lyn Farms when it purchased the horse.
Merritt argues the extra $70,000 payment was not erroneous and
not an overpayment because it would be treated as a capital

contribution by R&R to Pandora Farms, and presumably eventually
accounted for as a credit to R&R.  The Court has been presented
with insufficient evidence to determine how the $70,000 payment
was treated on Pandora Farms' books or whether it represents an
overpayment.  The Court therefore cannot order a set off for this
amount.  Any determination about how and to what extent the
$70,000 payment should be reimbursed will have to be addressed,
if at all, in the New York litigation.

R&R also seeks a set-off for two payments made to Mer-
Lyn Farms, both discussed above in section I.G.  The first is a
December 2004 wire transfer to Mer-Lyn for $15,124 in payment of
$8,644 in past expenses for September, October, and December 2004
and $6,480 in estimated expenses for December 2004 and January
2005.  The second is a March 22, 2005, wire transfer of $40,000
to Mer-Lyn from Ira Russack, which R&R contends was a payment
toward the estimated training expenses of the pinhooking horses.

The Court cannot apply a set-off for the $15,124 paid
in December 2004 because it cannot determine whether the payment
represents money that R&R has paid toward the bills at issue in
the counterclaim, or whether this payment has already been
applied, in whole or in part, to other bills which, having been
paid, are not at issue in the counterclaim.  None of the bills
from August 2004 to January 2005 for which Merritt seeks
reimbursement (listed in Def. Ex. 5-7) adds up, individually or

in combination, to the $15,124 amount of the wire transfer or the $8,644 and $6,480 in past and estimated expenses.  The Court therefore cannot connect the December 2004 payment to any particular expense for which Merritt seeks reimbursement.  Absent such a connection, the Court cannot determine whether the $15,124 payment should be credited against the bills in Merritt's counterclaim or whether the payment has already been applied to other expenses for which Merritt is not seeking reimbursement.  This issue may be able to be resolved in the New York litigation, but it cannot be resolved in the more limited litigation here.

The Court also cannot apply a set-off for the $40,000 wire transfer of March 22, 2005.  R&R's counsel suggests that this $40,000 payment was intended to pay for the estimated training expenses of the pinhooking horses, which Pelullo estimated in December 2005 would be $41,000.  R&R, however, has presented no evidence to support its assertion that the payment was made toward the horses' expenses.  The $40,000 wire transfer is listed in a July 2005 document (Pl. Ex. 59) prepared by Harvey Russack and setting out all of the wire transfers between September 2003 and July 2005 from Ira Russack or R&R to Merritt, Mer-Lyn, or the jointly owned LLCs.  The July 2005 document, however, does not list the purpose of any of the transfers.  Harvey Russack testified that the $40,000 payment was wired to Mer-Lyn, but did not testify as to its purpose.  10/25/06 Tr. at

189-92.  The only evidence to suggest that the payment was for training expenses for the pinhooking horses is that the $40,000 amount of the payment is close to Pelullo's $41,000 estimate of those expenses.  The similarity in dollar amount alone is not sufficient to establish the purpose of the payment.  Absent some basis for finding that the $40,000 payment was made toward the horses' expenses, the Court cannot award a set-off.

2.   Other Reductions to Merritt's Claimed Damages

The facts found by the Court in this Memorandum preclude Merritt from receiving reimbursement for several categories of expenses in her counterclaim.

a.   Expenses for Lipstick/Pulpit

As set out in section II.A., the Court has found that R&R is entitled to rescission of its contract for the purchase of Lipstick/Pulpit.  As previously discussed, the remedy of rescission does not just terminate the parties' agreement, it "unmakes" the agreement and consequently abrogates "all rights and responsibilities of the parties towards each other from the inception of the contract."  Keenheel, 579 A.2d at 1361 (internal quotation and citation omitted).  Because R&R's purchase of Lipstick/Pulpit has been rescinded and the horse is to be returned to Merritt, any benefit from Merritt's expenses for the

horse's training, care, and maintenance will accrue to Merritt, not R&R.  The Court therefore finds that Merritt's expenses incurred for Lipstick/Pulpit, amounting to $34,355.48, cannot be recovered in her counterclaim.

b.   Expenses for Pre-Purchase Expenses

The Court has found that, as part of R&R's agreement to purchase the pinhooking horses, R&R did not agree to assume responsibility for the costs of the pinhooking horses incurred prior to its purchase.  See Section I.E.3., above.  In her summary of the expenses sought in her counterclaim, Merritt includes bills incurred before R&R's October 2004 purchase of the horses.  These expenses, amounting to $1,967.00 for Mambo-Jambo and $9,393.75 for Splashing Wave, cannot be recovered in Merritt's counterclaim.[6]

c.   Expenses for Feed and Employee Expenses

The Court has found that the Russacks did not expect to pay room and board for the pinhooking horses for the time that they spent on jointly-owned property.  See Section I.G., above. Merritt has included a per diem charge for feed, hay, and straw and an allocation for employee time in her counterclaim.  The

---

[6]    The Court takes no view as to whether Merritt or Mer-Lyn Farms are entitled to reimbursement for all or part of these amounts in the New York litigation.

Court finds that Merritt is not entitled to reimbursement for these amounts.  The Court found credible the Russacks' testimony that they never agreed to pay for these amounts.  This was corroborated by the parties' course of conduct in which Merritt sent no request for reimbursement for these amounts until after the New York litigation was filed.  It was also corroborated by Harvey Russack's testimony, which the Court found credible, that the Russacks did not expect to pay these charges because Merritt was not charged rent for her personally-owned horses.

Given these facts, the Court finds that the agreement between the parties under which R&R agreed to reimburse Merritt and Mer-Lyn for expenses did not include an agreement for R&R to pay room and board or a per diem expense for feed and employee cost.  The Court further finds that payment for these expenses cannot be justified under an equitable theory of quasi-contract or unjust enrichment.  Recourse to such theories of recovery is only possible in the absence of an agreement.  <u>Mitchell v. Moore</u>, 729 A.2d 1200, 1203 (Pa. Super. Ct. 1999).  In addition, a finding that Merritt is not entitled to charge R&R for room and board is neither unjust or inequitable in light of testimony that Merritt was not charged rent for her horses.  The Court will therefore not award Merritt her counterclaim for these amounts, amounting to $8,610.40 for Mambo-Jambo and $9,268.40 for Splashing Wave.

3.   <u>The Amount to Be Awarded on the Counterclaim</u>

Merritt provided the Court with spreadsheets listing the expenses for which she seeks reimbursement in her counterclaim.  Pl. Ex. 5-7.  After subtracting from Merritt's counterclaim the expenses that the Court has found cannot be reimbursed, the Court finds that Merritt is entitled to judgment on her counterclaim in the amount of $28,432.76, of which $21,328.44[7] is reimbursement for expenses for Mambo-Jambo and $7,104.32[8] is reimbursement for expenses for Splashing Wave.

As discussed earlier, the Court will not enter a verdict on the counterclaim at this time, pending the resolution of R&R's motions for contempt.

C.   <u>Replevin Claims for Splashing Wave and Mambo-Jambo</u>

In its replevin claim asserted at trial, R&R sought to obtain possession from Merritt of two of the pinhooking horses, Mambo-Jambo and Splashing Wave.  Merritt concedes that R&R purchased both horses and is their owner.  Merritt has refused to turn over possession of the two horses, however, until R&R pays

_____

[7]   This amount is Merritt's claimed reimbursement for Mambo-Jambo of $31,905.84, less $1,967.00 in disallowed pre-purchase expenses and $8,610.40 in disallowed per diem expenses.

[8]   This amount is Merritt's claimed reimbursement for Splashing Wave of $25,766.47, less $9,393.75 in disallowed pre-purchase expenses and $9,268.40 in disallowed per diem expenses.

the bills incurred by Mer-Lyn Farms for their care and
maintenance that are the subject of Merritt's counterclaim.

Under Pennsylvania law, a person who, at another's
request, adds to the value of that other person's chattel by
labor, skill, or material can retain possession of the chattel
until he or she is paid for the value of the services rendered.
Aircraft Repair Servs. v. Stambaugh's Air Serv., Inc., 175 F.3d
314, 318 (3d Cir. 1999); Associates Fin. Servs. Co., Inc. v.
O'Dell, 417 A.2d 604, 606 (Pa. 1980).  In such circumstances, the
person rendering services or materials is deemed to have a
possessory lien.  Pennsylvania law describes such liens as
"fundamentally consensual" in nature, arising from an agreement,
express or implied, between the owner of the goods and the person
who renders services for those goods.  Associates Fin. Servs.,
417 A.2d at 606.  Under Pennsylvania law, animals can be the
subject of possessory liens.  Yearsley v. Gray, 21 A. 318 (Pa.
1891) (holding that, where a horse owner refused to pay a
landowner the fee agreed for pasturing, the landowner could
retain possession of the pastured horses under a common law lien
until the fee was paid).

Where a defendant to a replevin action asserts a
possessory lien as a defense, a court must determine the validity
of the lien.  If the lien is valid, the court can nonetheless
enter a verdict for the plaintiff by determining the amount of

the lien and then ordering the defendant to surrender possession upon payment of that amount.  See Mitchell v. McKinnis, 426 A.2d 142, 143 (Pa. Super. Ct. 1981); Pa. R. Civ. P. 1082 (permitting a court finding a valid possessory lien to enter conditional verdict in a replevin action).

Here, Merritt has a valid possessory lien in Splashing Wave and Mambo-Jambo.  After R&R purchased the pinhooking horses, the Russacks allowed Merritt and Pelullo to manage the horses, including choosing trainers for the horses and handling their attempted sale at auction.  Bills incurred for services for these horses were paid by Mer-Lyn Farms and reimbursement was sought from R&R.  Through their management, Merritt and her employee Pelullo added to the horses' value through their labor and skill, and thereby could assert a possessory lien when R&R refused to reimburse Merritt and Mer-Lyn for the services provided the horses.

Although the possessory lien entitled Merritt to retain possession of the horses in the face of R&R's demand for their return, Merritt's right of possession will terminate upon R&R's payment of the amount owed to Merritt.  Merritt has asserted a counterclaim for the amounts owed it by R&R.  The Court has evaluated that claim and found that Merritt is owed $28,432.76 for her expenses for Splashing Wave and Mambo-Jambo.  The Court finds that R&R would therefore be entitled to possession of

54

Mambo-Jambo and Splashing Wave upon payment of the $28,432.76 to Merritt.

Based on these findings, the Court could enter a conditional verdict in favor of R&R on its replevin claims, conditioned on R&R's satisfaction of Merritt's counterclaim.  As discussed earlier, however, R&R may no longer be pursuing its replevin claims, having contended in its pending contempt motions that Merritt has damaged one of the horses by gelding it and may have disposed of one or both horses in violation of the Court's orders by leasing the horses to a third-party.  The Court therefore will not enter a verdict on the replevin claim at this time, pending a hearing and a resolution of the motions for contempt.

An appropriate Order will be issued separately.